UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NEAL FRANCESE,

                          Plaintiff,                          12 Civ. 2210 (PKC)

          -vs-                                                MEMORANDUM
                                                              AND
                                                              ORDER
MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
------------------------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7-24-13_

P. KEVIN CASTEL, District Judge:

        Plaintiff Neal Francese, who retired after 20 years of service as a police officer

and detective employed by the New York City Police Department ("NYPD"), seeks judicial

review of a final decision by the Commissioner of Social Security (the "Commissioner") denying

his application for Social Security Disability benefits under Title II, 42 U.S.C. § 401 *et seq.*, and

Part A of Title XVIII of the Social Security Act.  Plaintiff asserts that the decision of the

Administrative Law Judge ("ALJ") finding plaintiff "not disabled" is "not supported by

substantial evidence and is based on errors of law." (Compl. ¶ 13.)  Specifically, he argues that

the ALJ (1) failed to apply the treating physician rule properly; and (2) wrongly assessed

plaintiff's credibility.  Plaintiff also seeks to have this Court consider evidence, which, he asserts,

is new and material.  (Pl.'s Mem. 1)  Defendant and plaintiff have each moved for judgment on

the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.  For the reasons explained below,

defendant's motion is granted.

## I. PROCEDURAL HISTORY

On September 2, 2008, plaintiff applied to the Social Security Administration ("SSA") for disability insurance benefits due to dilated cardiomylopathy, hypertension, high cholesterol, and leukemia (in remission since 1999).  (R. 64-65.)  On December 2, 2008, the SSA, after considering the plaintiff's medical history, age, education, and work experience, determined that plaintiff's conditions were not severe enough to prevent him from working and denied his application.  (R. 74, 76.)  The SSA notified plaintiff that his claim was disapproved and informed him of his right to request a hearing.  (R. 76-78.)

On January 6, 2009, plaintiff requested a hearing before an ALJ, which was held on March 11, 2010.  (R. 83, 91.)  An additional hearing was held on June 10, 2010.  (R. 25.)  Plaintiff appeared at both hearings and was represented by counsel.  (R. 21.)

In a written decision issued June 22, 2010, ALJ Dennis G. Katz denied plaintiff's claim for benefits.  (R. 13-20.)  After applying the five-step sequential test for determining whether an individual is disabled, the ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.  (R. 20.)  The ALJ based this conclusion on medical evidence from the records of plaintiff's treating cardiologist, specifically plaintiff's ability to perform a Bruce protocol test for eight minutes and 26 seconds.[1]  The ALJ declared this indicated "[plaintiff] was capable at the time of **substantial** physical exercise."  (R. 18; emphasis in the original.)  In reaching this conclusion, the ALJ declined to give controlling weight to the opinion of plaintiff's primary care physician, who completed a form stating that plaintiff could only sit or stand "less than six hours per day."  (R. 18.)  The ALJ explained that because

---

[1] During a Bruce protocol, the patient walks on a treadmill at 1.7 mph on a 10% incline, with the speed and incline increasing every three minutes. These tests evaluate "exercise tolerance and cardiac function." PubMed Health, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1123032/ (last visited June 12, 2013).

plaintiff's primary care physician was not a cardiologist and did not provide a "specific rationale for the conclusions reached," the primary care physician, despite being a treating physician, could not evaluate the plaintiff as effectively as the plaintiff's treating cardiologist.  (R. 18.)

On August 12, 2010, plaintiff requested review of the ALJ's decision.  (R. 5.) The SSA Appeals Council denied plaintiff's request, and the ALJ's decision became the final decision of the Commissioner on February 24, 2012.  (Compl. ¶ 12).

On March 26, 2012, plaintiff filed a timely action in this Court seeking review and reversal of the Commissioner's final decision.  (Compl. ¶ 1).  Plaintiff moved for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.  (Docket # 10).  Defendant responded by opposing plaintiff's motion and cross-moving for judgment in its own favor.  (Docket # 12).

II. EVIDENCE BEFORE THE ALJ

At the hearings before the ALJ, plaintiff testified about his age, background, education, family, work history, daily activities, and physical and psychiatric condition.  (R. 35-61.)  The ALJ also heard the testimony of a vocational expert, Esperanza DiStefano, regarding potential employment available to plaintiff.  (R. 29-41.)  The ALJ reviewed documentary evidence including: a letter from oncologist Dr. Karen Seiter (R. 360.); plaintiff's history of medication (R. 205.); progress and treatment reports from cardiologist Dr. Donald Miller (R. 227, 322-331, 363-366.); medical advice, based on previous reports, by state review physician Dr. R. Blaber (R. 341-342.); a physical capacity assessment by state analyst Dr. M. Mayer (R. 343-348.); an examination report from Dr. Mark J. Stern (R. 368.); and letters and assessments by plaintiff's primary care physician, Dr. Erika Krauss. (R. 334-338, 354, 371-373.)

A. *Non-Medical Evidence*

Plaintiff was born on April 6, 1958.  (R. 54.)  He was 50 years old when he applied for disability insurance benefits and 51 at the time of the first hearing.  (R. 64, 83.)  He was five feet five inches tall and weighed 200 pounds.  (R. 173.)  Plaintiff completed two years of college in 1979-80 and later graduated from the police academy in 1986.  (R. 179.)  He worked as a police officer and detective with the NYPD for 20 years before retiring in 2006.  (R. 175.)  Plaintiff testified he was the lead detective on a federal drug case that required long hours for the last year and a half of his employment, causing extreme fatigue and stress.  (R. 47-48.)  Furthermore, he indicated his cardiologist "didn't want [him] to do work anymore" and NYPD doctors declared him unable to continue working in any capacity.  (R. 47, 49.)  Vocational expert Esperanza DiStefano testified that plaintiff's work history gave him the skills necessary to perform the jobs of dispatcher, investigator, information clerk, or bonding agent, assuming he was able to perform sedentary work.  (R. 32-34.)

At the time of the administrative hearing, plaintiff lived with his wife and son in a house in Pelham Manor, New York.  (R. 50.)  He testified that while he could drive his son to school and do some light shopping, he could not "drive for long periods of time."  (R. 50.)  Plaintiff occasionally drove to see his other son in Boston but indicated he had to take "two, three, sometimes more" stops on the way to "stretch [his] legs and walk around the car."  (R. 56.)  Additionally, plaintiff said he went out to dinner with friends every few weeks and to the movies with his wife.  (R. 50.)  Plaintiff testified he took a vacation to the Jersey shore with his wife in the four years before the hearing.  (R. 57.)  He also claimed he had trouble walking up the stairs of his home, walking more than a block, vacuuming, lifting heavy things, and sitting down for extended periods of time.  (R. 54-57.)

B. *Medical Evidence*

The ALJ reviewed medical documents and letters about the plaintiff from Drs. Seiter, Krauss, Miller, and Stern.  (R. 15, 17-18.)  Furthermore, the ALJ reviewed the evaluation of Dr. Blaber, a state review board doctor who gave medical advice based on plaintiff's records. (R. 17-18.)  Finally, the ALJ addressed the opinion of a state agency analyst, Dr. Mayer.  (R. 17.)

I. *Treating Physicians' Records*

Plaintiff was treated by Karen Seiter, M.D., a professor of medicine in the Division of Oncology/Hematology of New York Medical College, for leukemia in 1999.  (R. 360.)  He "received intensive chemotherapy" for seven months and Dr. Seiter wrote that plaintiff was now in complete remission.  (R. 360.)  She concluded that it was "extremely unlikely" plaintiff's current cardiac issues were related to the chemotherapy treatment.  (R. 360.)

Dr. Erika Krauss, a physician, began treating plaintiff in January, 1998.  (R. 334.) In an evaluation for the New York State Office of Temporary and Disability Assistance on October 20, 2008, Dr. Krauss indicated plaintiff was diagnosed with hypertension and cardiomyopathy.[2]  (R. 334.)  Further, Dr. Krauss described plaintiff's condition as "life-long" and that he experienced symptoms like shortness of breath after light exertion; plaintiff could not walk more than one block without fatigue.  (R. 334-337.)  Dr. Krauss referenced a March 2008 nuclear stress test, a March 2008 echocardiogram, and a November 2007 electrocardiogram as laboratory findings about the plaintiff.  (R. 336.)  Lastly, Dr. Krauss checked boxes indicating that plaintiff could: "lift and carry occasionally (up to 1/3 of a work day);" stand or walk "less

---

[2] "Cardiomyopathy is a weakening of the heart muscle or another problem with the heart muscle. It often occurs when the heart cannot pump as well as it should, or with other heart function problems. Most patients with cardiomyopathy have heart failure." PubMed Health, U.S. NATIONAL LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002095/ (last visited June 6, 2013).

than 2 hours per day;" sit "less than 6 hours per day;" and could push or pull only with his arms. (R. 337.)

On May 28, 2010, Dr. Krauss completed a form document titled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)." (R. 371.) She indicated: plaintiff's maximum lifting ability was less than ten pounds; he could stand and walk less than two hours per workday; his maximum ability to sit was two hours; he could only sit for five minutes before needing to change position; and he could not stand at all without changing position. (R. 372.) Additionally, plaintiff had to walk around every five minutes for at least five minutes in duration; he required the ability to move between sitting and standing at all times; and he would need to lie down at random times throughout the day. (R. 372.) Dr. Krauss wrote that the limitations she expressed were supported by plaintiff's cardiomyopathy. (R. 372.)

During her treatment of plaintiff in June of 2006, Dr. Krauss referred him to a board-certified cardiologist, Dr. Donald Miller.[3] (R. 227.) On June 22, 2006, Dr. Miller wrote that plaintiff performed a Bruce protocol for ten minutes and four seconds before it was "terminated due to shortness of breath." (R. 327.) Dr. Miller concluded plaintiff demonstrated a "very [g]ood level of cardiopulmonary fitness," found the test negative for myocardial ischemia, and noted "severe hypertension." (R. 325.) On September 5, 2007, Dr. Miller wrote a letter to Dr. Krauss informing her that his impression of plaintiff included "a history of hypertension [and] non-ischemic cardiomyopathy." (R. 323.)

Another test was performed on March 12, 2008, with Dr. Miller writing that plaintiff performed another Bruce protocol test for over nine minutes before it was "terminated due to generalized fatigue." (R. 325.) Dr. Miller concluded plaintiff demonstrated a "[g]ood

---

[3] Dr. Miller is identified as "FACC," which stands for "Fellow of the American College of Cardiology." American College of Cardiology, http://www.cardiosource.org/en/ACC/About-ACC/Who-We-Are/ACC-Member-Profile.aspx (last visited July 23, 2013).

level of cardiopulmonary fitness." (R. 325.) A final Bruce protocol test was performed on July 1, 2009, with similar results. (R. 364.) Additionally, plaintiff indicated on his request for disability form that Dr. Miller performed two additional tests on his heart in 2008, an EKG heart test and an MRI/CT scan on his heart. (R. 179.) Dr. Miller also prescribed five medications for plaintiff: Bayer aspirin for "heart health;" Coreg to slow down plaintiff's heart rate; Gemfibrozil for triglycerides; Spironolactone "to prevent heart enlargement;" and Vasotec for plaintiff's hypertension. (R. 178.)

Dr. Mark Stern, also a board-certified cardiologist,[4] examined plaintiff on June 7, 2010, three days before the second hearing. (R. 368.) He found plaintiff had cardiomyopathy "exacerbated and perhaps caused by work related stress as a [p]olice [o]fficer." (R. 368.) Dr. Stern concluded that plaintiff was "permanently disabled" from "active [p]olice work" due to "physical and psychological stress" and that plaintiff's disability was "permanent and total." (R. 368.) Dr. Stern advised plaintiff that he should "avoid physical and psychological stress." (R. 368.)

II. *Non-treating Physicians' Reports*

In November of 2008, Dr. R. Blaber, working for the New York State Office of Temporary and Disability Assistance, wrote advice on plaintiff's condition based on the medical reports at that time. (R. 341.) Dr. Blaber observed plaintiff's cardiomyopathy and leukemia (in remission) and his "good exertional tolerance on exercise studies." (R. 341.) Dr. Blaber concluded that plaintiff was capable of "lifting 20 pounds occasionally, 10 pounds frequently, sitting 6 hours, [and] standing and or walking 6 hours." (R. 341.) He also stated plaintiff was "limited from dusts and fumes" and "restricted from heights [and] dangerous machinery." (R. 341.)

---

[4] Additionally, Dr. Stern is identified as "FACC." See American College of Cardiology, supra note 3.

In a similar report filed December 1, 2008, state analyst Dr. M. Mayer evaluated plaintiff's physical capacity based on medical reports in plaintiff's file at that time.  (R. 343-348.)  Dr. Mayer checked boxes indicating plaintiff could occasionally lift twenty pounds, frequently carry ten pounds, stand or walk for about six hours in an eight hour workday, and sit for about six hours in an eight hour workday.  (R. 344.)  Dr. Mayer wrote that while plaintiff might have "some functional limitations" due to his condition, because he was "able to do his own personal care, drive a car and grocery shop," the degree of limitation alleged was too severe.  (R. 347.)  With respect to Dr. Krauss' opinion about plaintiff's limited ability to lift, Dr. Mayer concluded that it was "non-specific and therefore granted no weight" in his analysis.  (R. 347.)  Further, Dr. Mayer wrote that Dr. Krauss' statements regarding limitations on plaintiff's ability to stand and sit were specific but "not consistent with evidence in the file and therefore granted no weight."  (R. 347.)

III. APPLICABLE LAW

A. *Standard of Review*

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if the movant establishes "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law."  <u>Juster Assocs. v. City of Rutland, Vt.</u>, 901 F.2d 266, 269 (2d Cir. 1990) (citations omitted).  Judgment on the pleadings is appropriate where no material facts are in dispute, and "where a judgment on the merits is possible merely by considering the contents of the pleadings."  <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).

Review of the Commissioner's final decision denying disability benefits is limited. The court may not determine de novo whether the claimant is disabled. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. See 42 U.S.C. § 405(g) ("The findings of the Commissioner, . . . if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)). Therefore, a court's review involves two levels of inquiry. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). First, the court must review "whether the Commissioner applied the correct legal standards." Id.; see Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987). Second, the court must decide whether the Commissioner's decision is supported by substantial evidence. Tejada, 167 F.3d at 773.

The ALJ's "[f]ailure to apply the correct legal standards is grounds for reversal." Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)). The ALJ's factual findings supported by substantial evidence are "binding" on this court; however, "where an error of law has been made that might have affected the disposition of the case," this court cannot simply defer to the ALJ's factual findings. Id. Legal error may include failure to adhere to the applicable regulations. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing Schaal v. Apfel, 134 F.3d 496, 504-05 (2d Cir. 1998)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of N.Y. v. N.L.R.B., 305 U.S.

197, 229 (1938)); accord Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam).

Relevant evidence includes inferences and conclusions drawn from evidentiary facts. Rivas v.

Barnhart, 2005 WL 183139, at *18 (S.D.N.Y. Jan. 27, 2005) (citations omitted).  "Where the

Commissioner's decision rests on adequate findings supported by evidence having rational

probative force, [the court] will not substitute [its] judgment for that of the Commissioner."

Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  While the substantial evidence standard is

deferential, it still "gives federal courts the freedom to take a case-specific, comprehensive view

of the administrative proceedings" including "weighing all the evidence" to determine if it was

substantial.  Brault v. Social Sec. Admin., Com'r, 683 F.3d 443, 449 (2d Cir. 2012).  However,

even if there is substantial evidence contrary to the Commissioner's position, the

Commissioner's determination will not be disturbed.  See DeChirico v. Callahan, 134 F.3d 1177,

1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial

evidence for both sides).

When reviewing the factual record, it is not this Court's role "to resolve

evidentiary conflicts . . . [nor] to appraise the credibility of witnesses, including the claimant;"

instead, those are judgments for the Commissioner to make.  Carroll v. Sec'y of Health and

Human Services, 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).  Accordingly, genuine

conflicts in the medical evidence are for the Commissioner to resolve.  Veino, 312 F.3d at 588

(citations omitted).  Courts give great deference to an ALJ's credibility determination because

the ALJ had the opportunity to observe plaintiff's demeanor while testifying.  Ruiz v. Barnhart,

2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413,

1419 n.6 (S.D.N.Y. Apr. 24, 1995).

Before deciding if the Commissioner's determination is supported by substantial evidence, courts must first be satisfied that the claimant received "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act."  Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir. 1972)).  The ALJ has an affirmative duty to fully and fairly develop an administrative record.  Echevarria, 685 F.2d at 755.  This duty arises from the essentially non-adversarial nature of a benefits proceeding where the Secretary is not represented.  Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).  "[W]here there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history 'even when the claimant is represented by counsel . . . .'"  Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996).  To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights.  Robinson v. Sec'y of Health and Human Servs., 733 F. 2d 255, 258 (2d Cir. 1984) (citation omitted).  "If the reviewing court determines that a claimant did not receive a 'fair and adequate hearing' before the ALJ, . . . it must remand the case to the Commissioner . . . ."  Watson v. Astrue, 2009 WL 6371622, at * 5 (S.D.N.Y Feb. 4, 2009) (citing Echevarria, 685 F.2d at 755-57).

B. *Five-Step Disability Determination*

The Social Security Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). The Act provides that "an individual shall be determined to be under a disability only if his

physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy, regardless of

whether such work exists in the immediate area in which he lives, or whether a specific job

vacancy exists for him, or whether he would be hired if he applied for work."

42 U.S.C. § 423(d)(2)(A); Rosa, 168 F.3d at 77.  The Commissioner's determination of a

claimant's disability follows a five-step sequential analysis promulgated by the SSA.

20 C.F.R. § 404.1520.  The Second Circuit has described this analysis as follows:

> "First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, [second,] the [Commissioner] considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Fifth, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa, 168 F.3d at 77 (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam));

accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

          The claimant bears the burden of proof for the first four steps.  Shaw v. Chater,

221 F.3d 126, 132 (2d Cir. 2000).  If the claimant meets his burden on the first four steps, then

the burden shifts to the Commissioner at the fifth step to "show there is other gainful work in the

national economy which the claimant could perform."  Draegert, 311 F.3d at 472 (citing Carroll

v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983)).  Work that exists in

the national economy "means work which exists in significant numbers either in the region

where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

When considering this analysis, the Commissioner considers: "(1) objective medical facts and

clinical findings; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence

of pain or disability; and (4) claimant's educational background, age, and work experience."

Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983)).  Further, the Commissioner "shall consider the combined effect of all the

individual's impairments." 42 U.S.C. § 423(d)(2)(B); see Dixon v. Shalala, 54 F.3d 1019, 1031

(2d Cir. 1995) (holding that "the SSA must evaluate [the] combined impact on a claimant's

ability to work").

C. *Treating Physician Rule*

      The opinion of a claimant's treating physician "regarding the nature and severity

of [claimant's] impairments" will be given controlling weight if it "is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with

the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); Green-Younger

v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).  Furthermore, "the lack of specific clinical findings

in the treating physician's report [does] not, standing by itself, justify the ALJ's failure to credit

the physician's opinion." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998);

Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).  However, the treating physician's opinion is

not afforded controlling weight when it is inconsistent with other substantial evidence in the

record, such as the opinions of other medical experts. 20 C.F.R. § 404.1527(d)(2); Snell v.

Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  In such a case, a report from a consultative physician

may constitute substantial evidence. Mongeur, 722 F.2d at 1039; Carrington v. Barnhart, 2005

WL 2738940, at *9 n.2 (S.D.N.Y. Oct. 19, 2005).  "[T]he less consistent [the treating

physician's] opinion is with the record as a whole, the less weight it will be given." Snell, 177

F.3d at 133; see 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).  Further, a treating physician's

opinion that the claimant is "disabled" or "unable to work" is not controlling.

20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).

   If the treating physician's medical opinion is not afforded controlling weight, the

following factors must be considered to determine the weight given to the opinion: (i) the

frequency of the examination and the length, nature, and extent of the treatment relationship; (ii)

the evidence in support of the treating physician's opinion; (iii) the opinion's consistency with

the record as a whole; and (iv) whether the treating physician is a specialist.  See Clark v.

Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2)).  Furthermore, when the ALJ gives the treating physician's opinion less than

controlling weight, he must provide good reasons for doing so.  Id.; see also Schaal v. Apfel, 134

F.3d 496, 505 (2d Cir. 1998) (stating that the ALJ must "set forth his reasons for the weight he

assigns to the treating physician's opinion"); Snell, 177 F.3d at 134 ("The requirement of reason-

giving exists . . . to let claimants understand the disposition of their cases . . . even—and perhaps

especially—when those dispositions are unfavorable.").

## IV. DISCUSSION

### A. *The ALJ's Decision*

   The ALJ applied the five-step evaluation process to determine whether plaintiff is

disabled pursuant to The Social Security Act. 20 C.F.R. § 404.1520(a).  First, at step one, the

ALJ had to determine if plaintiff was engaging in substantial gainful activity.

20 C.F.R. § 404.1520(b).  The ALJ found that plaintiff had not engaged in substantial gainful

activity since November 2, 2006, the alleged onset of his condition.  (R. 15.)  At step two, the

ALJ had to analyze whether plaintiff had a severe impairment.  20 C.F.R. § 404.1520(c).  The

ALJ found that plaintiff had a cardiovascular impairment and hypertension that constituted

severe impairments because they caused "a significant limitation in the claimant's ability to

perform basic work activities."  (R. 15.); see 20 C.F.R. § 404.1520(c).  At step three, however,

the ALJ did not find the impairments to "meet[] or medically equal[] one of the listed

impairments in . . . 20 C.F.R. § 404.1520(d)," thus plaintiff was not *per se* disabled.  (R. 16.)

 Before moving to step four, the ALJ was required to determine plaintiff's residual

functional capacity.  See 20 C.F.R. § 404.1520(e).  The ALJ found that plaintiff could perform

"light exertion work activity with the following limitation: he cannot perform sustained aerobic

activity during the course of an eight hour workday."  (R. 16.)  The ALJ further indicated that

plaintiff was able to sit for eight hours, stand or walk for six hours and could carry objects

weighing up to twenty pounds occasionally and ten pounds frequently.  (R. 16.)  The ALJ

reached this finding by considering a two-step process: first, "whether there is an underlying

medically determinable physical or mental impairment(s);" and second, once that impairment has

been established, examine the effects of the plaintiff's symptoms "to determine the extent to

which they limit the [plaintiff's] functioning."  (R. 16.)

 In reaching his conclusions about plaintiff's residual functional capacity, the ALJ

considered plaintiff's testimony and the treating medical evidence, finding them to be

inconsistent.  (R. 17.)  According to the ALJ, plaintiff's testimony indicated he considered his

symptoms severe enough to keep him "homebound."  (R. 16.)  When examining the medical

evidence, the ALJ relied heavily on the opinion of a specialist, a board-certified cardiologist, Dr.

Miller, finding that "nothing in the contemporaneous treating notes" suggested plaintiff was truly

"homebound."  (R. 18.)  The ALJ gave less consideration to the opinion of plaintiff's primary

care physician, Dr. Krauss, who indicated that plaintiff's residual functional capacity was

severely limited.  (R. 18.)  The ALJ justified this reasoning by indicating that Dr. Krauss was

"not a cardiologist" and there was "no specific rationale for the conclusions [she] reached."  (R.

18.)

   The ALJ then proceeded to step four of the disability determination and

concluded plaintiff was unable to perform any past relevant work.  (R. 19.);

20 C.F.R. § 404.1565.  Step five shifted the burden to the Commissioner to demonstrate plaintiff

had the residual functional capacity to perform other jobs existing in significant numbers in the

national economy.  20 C.F.R. § 404.1569; see Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir.

2002) (citation omitted).  The ALJ found that the Commissioner had met that burden and

referenced the testimony of the vocational expert indicating various positions the plaintiff could

hold using past work skills, given his residual functional capacity.  (R. 19.)  Thus, according to

the ALJ, plaintiff was "not-disabled" under Medical-Vocational Rules 201.22, 201.15, 202.20,

and 202.13.  (R. 20.)

B. *Weight Afforded To Physicians' Opinions*

   The ALJ declined to give controlling weight to the opinion of the primary care

physician, Dr. Krauss, instead focusing primarily on the opinion of plaintiff's treating specialist,

Dr. Miller.  (R. 18.)  The ALJ determined that Dr. Krauss and Dr. Miller's opinions were

contradictory because Dr. Krauss set definitive limits on plaintiff's functional ability, while Dr.

Miller "identified no physical restrictions" and "indicated that the [plaintiff] was capable of

substantial physical exercise."  (R. 18.)  Further, the ALJ found Dr. Krauss and Dr. Blaber's

opinions contradictory because each indicated a different level of residual functional capacity.

(R. 18.) The ALJ determined that because these opinions were contradictory, and Dr. Miller was

16

a cardiologist, while Dr. Krauss was not, greater evidentiary weight should be given to Dr. Miller's opinion, supported by Dr. Blaber's assessment.  (R. 18.)

       Plaintiff argues that the opinions of Drs. Krauss and Miller are not contradictory and Dr. Blaber's opinion should be given less evidentiary weight than Dr. Krauss' opinion because he was a non-examining physician.  (Pl.'s Mem. 18-19.)  Furthermore, plaintiff argues that the ALJ was incorrect in stating that Dr. Miller "imposed no physical restrictions" on plaintiff because Dr. Miller simply did not address plaintiff's physical capacities during the workday.  (Pl.'s Mem. 18.)  Thus, according to plaintiff, because Dr. Miller's opinion did not discuss specific restrictions on plaintiff during the workday, his opinion does not necessarily contradict the opinion of Dr. Krauss.  Even if the opinions are deemed contradictory, plaintiff argues that the ALJ erred in not deferring to Dr. Krauss' opinion.  (Pl.'s Mem. 16.)

       In this case, there is a conflict between two treating physicians, plaintiff's primary care doctor, Dr. Krauss, and Dr. Miller, the cardiac specialist to whom plaintiff was referred by the primary care doctor.  The ALJ's placement of greater weight on the treating cardiologist's assessments was well grounded in the record.  The conditions under which plaintiff claimed entitlement to disability benefits were conditions within Dr. Miller's area of specialty and for which he was treating plaintiff.  Plaintiff self-described the conditions that limit his ability to work as follows:

> Heart, High Blood pressure, High cholestorol,(leukemia in remission since 1999) I have dilated coronary mylopathy - I have severe shortness of breath with chest pain. I feel dizzy. I cannot exert myself and must avoid stress. my left ventricular ejection fraction was tested at 27% and 36% the last 2 times it was tested. Heart high blood pressure high cholestorol

(R. 174; punctuation and spelling as in original.)

It was Dr. Miller, not Dr. Krauss, who had prescribed the five medications for cardiac-related conditions, including medications to slow the heart rate, address hypertension and prevent heart enlargement.  (R. 178.)  Further, plaintiff himself identified only two specific, heart-related tests, both performed by Dr. Miller.  (R. 179.)  Dr. Miller reported on January 5, 2007 that an exercise stress test "demonstrated normal myocardial perfusion with very good cardio pulmonary fitness."  (R. 227.)  He later wrote to Dr. Krauss on September 5, 2007 that plaintiff is "without any symptoms referable to his cardiovascular system."  (R. 322.)  Dr. Miller described the plaintiff, then 49 years old, as "well nourished and well developed in no apparent distress.  Blood pressure is 110/80 bilaterally.  Heart rate is 72 BPM.  Respirations are 14 and comfortable . . . Cardiac exam is S1, S2 with no murmurs or gallops.  There is no jugular venous distention."  Dr. Miller's concluding "[i]mpression" was that plaintiff was "without any signs or symptoms consistent with either ischemia or congestive heart failure."  (R. 322-23.)  In sum, all of Dr. Miller's statements written to Dr. Krauss indicate that plaintiff did not suffer from any heart condition that imposed a significant limitation upon him.

Additionally, on March 12, 2008, Dr. Miller referred plaintiff for a Bruce protocol test.  (R. 325.)  The purpose of Bruce protocol tests is to evaluate "exercise tolerance and cardiac function" and general heart health.  See PubMed Health, supra note 1.  Plaintiff "achieved a maximal heart rate of 162 which is 95% of the predicted maximal heart rate."  (R. 325.)  The test was terminated due to "generalized fatigue."  (R. 325.)  The test operator noted "no symptoms of cardiac distress" and "no significant arrhythmias during exercise or recovery."  (R. 325.)  Dr. Miller's "[i]mpression" was

plaintiff had "[n]o chest pain. Good level of cardiopulmonary fitness. Stress

electrocardiographic portion of the test is uninterpretable for myocardial ischemia."  (R.

325.)

   Another Bruce protocol test was performed by plaintiff on July 1, 2009.

(R. 364.)  He "achieved a maximal heart rate of 193," more than "100% of the predicted

maximal heart rate."  (R. 364.)  The test was terminated due to "shortness of breath."  (R.

364.)  The test operator noted "symptoms of chest discomfort" at the seven minute mark

while the heart rate was at 156.  (R. 364.)  The discomfort was "resolved by 30 seconds

with cool-down."  (R. 364.)  Dr. Miller described plaintiff as having "[u]pper chest

discomfort with exercise . . . Good level of cardiopulmonary fitness."  (R. 364.)  Dr.

Miller in every test described plaintiff as having a good or better level of heart fitness and

found no indication plaintiff was unable to perform the Bruce protocol test at an

acceptable level of exercise.

   Contemporaneous records from Dr. Krauss, the primary care physician,

were not part of the record before the ALJ.  She completed a form filed as part of

plaintiff's claim on October 20, 2008 indicating limitations on plaintiff's ability to stand,

sit, or lift during a workday based on years of evaluating plaintiff's medical condition.

(R. 337.)  Dr. Krauss listed tests in support of her findings limiting plaintiff's residual

functional capacity: a March 2008 nuclear stress test, a March 2008 echocardiogram, and

a November 2007 electrocardiogram.  (R. 336.)  These tests, however, were not produced

before the ALJ and thus he correctly concluded that Dr. Krauss did not provide any

"specific rationale for the conclusions reached," so the claim form was afforded little

weight compared to Dr. Miller's reported test results.  (R. 18; See Roma v. Astrue, 468 F.

App'x 16, 18 (2d Cir. 2012) (holding a treating physician's opinion is accorded controlling weight when it is supported by "medically acceptable clinical and laboratory techniques").

On May 28, 2010, Dr. Krauss signed a form entitled: "Medical Opinion re: Ability to Do Work-Related Activities (Physical)."  (R. 371.)  The form contained instructions such as: "Do not consider your patient's age, sex or work experience."  (R. 371) Further, it asks for a "yes" or "no" response to the question: "Does your patient need the opportunity to shift *at will* from sitting or standing/walking?"  (R. 372; emphasis in the original.)  An affirmative response to this question does not convey any clear meaning to the reader and is consistent with an office worker who needs the opportunity to stand up and stretch once in a while.  Dr. Krauss also checked "yes" to the question "[w]ill your patient sometimes need to lie down at unpredictable intervals during a work shift?"  (R. 372.)  The conclusory response to this leading question was not entitled to significant weight when matched against the tests reported by Dr. Miller.[5]

Dr. Blaber's opinion (affirmed by Dr. Mayer) contradicts Dr. Krauss because it sets plaintiff's residual functional capacity at a higher level.  (R. 341.)  While Dr. Blaber did not examine plaintiff personally and made an assessment simply based on looking at medical records, his opinion is significant as it is consistent with Dr. Miller's opinion, and thus provided another reason for the ALJ to give less weight to the opinion of Dr. Krauss.  See Carrington v. Barnhart, 2005 WL 2738940, at *9 n.2 (S.D.N.Y. Oct. 19, 2005); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be

_____

[5] Dr. Krauss did acknowledge that plaintiff may occasionally twist, stoop, or climb stairs but never climb ladders or crouch. (R. 372.)

given."); see 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).  Furthermore, the ALJ

correctly noted Dr. Stern's singular examination of plaintiff was not of substantial value.

Dr. Stern's observation that plaintiff is "disabled" from police work was a conclusory

finding that is reserved for the Commissioner. (R. 18.); 20 C.F.R. § 404.1527(e)(1).

   The ALJ was justified in giving Dr. Miller's opinion more weight because Dr.

Miller was a cardiologist, while Dr. Krauss was not.  (R. 18.)  Because there is no dispute that

Dr. Krauss is a treating physician, the ALJ needed to provide a specific reason to set aside her

opinion.  According to Clark v. Comm'r of Soc. Sec., whether the treating physician is a

specialist is a factor that must be considered if the treating physician's opinion is not given

controlling weight. 143 F.3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2)).  Dr. Krauss, a primary care physician, referred plaintiff specifically to Dr. Miller,

presumably for his expertise as a cardiologist that she could not provide.  (R. 227.)  Even though

Dr. Krauss treated plaintiff for a longer period than Dr. Miller, the ALJ did not err in placing

weight on Dr. Miller's status as specialist in cardiology.

   When a plaintiff submits medical records to a court that were not submitted to the

Commissioner, "the court may remand the case to the Commissioner for consideration of the

new evidence if that evidence is material—meaning that it is new and not merely cumulative of

the evidence already in the record—and 'there is good cause for the failure to incorporate such

evidence into the record in a prior proceeding.' "  Travers v. Astrue, 2013 WL 1955686, at *2

(S.D.N.Y. May 13, 2013) (quoting Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988)); see 42

U.S.C. § 405(g); see also Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004).

   Here, the evidence submitted by plaintiff consists of a letter from Dr. Miller to Dr.

Krauss written December 10, 2010, indicating plaintiff "[o]n physical exam, [] is well nourished,

well developed, in no apparent distress . . . Cardiac exam reveals S1, S2 without murmurs, gallops, or rubs. There is no jugular venous distention."  Dr. Miller's "[i]mpression" was that plaintiff "is doing well without any symptoms referable to his cardiovascular system."  (Pl.'s Mem. Ex. B.)  Plaintiff also submitted an "evaluation of systolic function" by Dr. Miller on December 21, 2010 stating "[s]everely depressed global left ventricular systolic function."  (P.'s Mem. Ex. B.)  Finally, plaintiff wishes to introduce evidence that he had a pacemaker installed on March 10, 2011.  (Pl.'s Mem. Ex. B.)

The evidence submitted by plaintiff does not relate to the period during which benefits were denied, which ended with the ALJ's decision on June 22, 2010.  See Tirado, 842 F.2d at 597 (holding that evidence must be relevant to the time period in question).  Further, the evidence does not undermine the ALJ's conclusions.  Rather, it reinforces Dr. Miller's earlier opinion that plaintiff had a good level of fitness.  See id.  Therefore, the evidence proffered by plaintiff is not new or time-appropriate and thus is not cause for remand.

This Court also gives deference to the ALJ's credibility determination because he observed plaintiff's demeanor at the hearings.  See Ruiz v. Barnhart, 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006).

Because substantial evidence supports the ALJ's conclusions with respect to plaintiff's disability, this Court affirms the Commissioner's determination that plaintiff is not disabled.  Further, because the ALJ's residual functional capacity determination was supported by substantial evidence, this Court concludes that the Commissioner satisfied his burden of proving alternative substantial gainful employment opportunities, appropriate for plaintiff's physical, mental, and vocational capabilities.  See Dumas v. Schweiker, 712 F.2d 1545, 1554. Under the substantial evidence rule, this Court affirms the ruling.  42 U.S.C. § 405(g).

V.  CONCLUSION

The ALJ properly applied the five-step sequential analysis to determine that plaintiff is not disabled and the decision was supported by substantial evidence in the record. Defendant's motion for judgment on the pleadings upholding the decision of the Commissioner is affirmed and the plaintiff's complaint is dismissed.


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        July 24, 2013

23